IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

APR 24   8 48 AM '98

CLERK, U...COURT
WESTERN DI... TEXAS
...TY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* JAMES DEVAGE,<br>Plaintiff<br><br>VS.<br><br>HEALTHSOUTH CORPORATION,<br>HEALTHSOUTH TEXAS LIMITED<br>PARTNERSHIP, HEALTHSOUTH SPORTS<br>MEDICINE AND REHABILITATION<br>CENTER AND ALL DIRECT<br>AND INDIRECT SUBSIDIARIES AND<br>AFFILIATED PARTNERSHIPS<br>OF HEALTHSOUTH CORPORATION,<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

SA98CA0372

**DWS**

CIVIL ACTION NO. SA-98-CA-

<u>**PLAINTIFF'S COMPLAINT UNDER 31 U.S.C. § 3730 (UNDER SEAL)**</u>

TINSMAN & HOUSER, INC.
Richard Tinsman
State Bar No. 20064000
Sharon Savage
State Bar No. 04747200
One Riverwalk Place
700 N. St. Mary's Street, 14th Floor
San Antonio, TX  78205
Tel: 210-225-3121
Fax: 210-225-6235
**ATTORNEY IN CHARGE**

GLENN GROSSENBACHER
State Bar No. 08541100
1800 McCullough
San Antonio, TX  78212
Tel: 210-271-3888
Fax: 210-271-3980

GOODE, CASSEB & JONES
Rand J. Riklin
State Bar No. 16924275
John E. Clark
State Bar No. 04287000
One Riverwalk Place, Suite 1700
700 N. St. Mary's Street
San Antonio, TX  78205
Tel: 210-225-6030
Fax: 210-224-9810

*I.*

# TABLE OF CONTENTS

**Page**

THE PARTIES ........................................................................................................ 1

FILING UNDER SEAL .......................................................................................... 3

JURISDICTION AND VENUE ............................................................................... 3

PRELIMINARY STATEMENT OF HEALTHSOUTH'S FRAUDULENT CONDUCT .......... 4

PLAINTIFF'S DIRECT AND INDEPENDENT KNOWLEDGE AND VOLUNTARY
DISCLOSURE OF HEALTHSOUTH'S FRAUDULENT CONDUCT ...................... 4

BACKGROUND ...................................................................................................... 4

    OVERVIEW OF HEALTHSOUTH'S ORGANIZATIONAL STRUCTURE
    AND OPERATIONS ......................................................................................... 4

    HEALTHSOUTH'S PARTICIPATION IN FEDERAL HEALTH CARE
    PROGRAMS ...................................................................................................... 6

    CONDITIONS FOR PAYMENT OF OUTPATIENT PHYSICAL THERAPY
    SERVICES UNDER FEDERAL HEALTH CARE PROGRAMS ..................... 8

    CODING AND TERMINOLOGY SYSTEMS USED TO REPORT AND BILL
    PROCEDURES AND SERVICES ................................................................... 11

    CODING FOR PHYSICAL MEDICINE AND REHABILITATION SERVICES
    AND PROCEDURES ....................................................................................... 13

HEALTHSOUTH'S FRAUDULENT CONDUCT .............................................. 15

    BILLING GOVERNMENTAL PAYORS FOR INDIVIDUAL THERAPEUTIC
    EXERCISE (GYM) SERVICES NOT PERFORMED AND/OR NOT MEDICALLY
    NECESSARY AND/OR UPCODING ............................................................. 15

    BILLING GOVERNMENTAL PAYORS FOR INDIVIDUAL AQUATIC
    THERAPY SERVICES NOT PERFORMED AND/OR NOT MEDICALLY
    NECESSARY AND/OR UPCODING ............................................................. 17

    MISREPRESENTING PLACE OF SERVICE ................................................ 19

<u>Page</u>

ILLEGAL REFERRALS-ANTI-KICKBACK AND STARK VIOLATIONS............... 19

THE UNITED STATES HAS BEEN DAMAGED ................................................... 22

COUNT ONE-- FALSE CLAIMS ACT 31 U.S.C. § 3729 (a)(1) ............................................... 22

COUNT TWO-- FALSE CLAIMS ACT 31 U.S.C. § 3729 (a)(2) ........................................... 23

COUNT THREE-- FALSE CLAIMS ACT 31 U.S.C. § 3729 (a)(3) ........................................ 23

COUNT FOUR-- UNJUST ENRICHMENT ............................................................................ 24

COUNT FIVE-- PAYMENT BY MISTAKE OF FACT ........................................................... 24

COUNT SIX-- COMMON LAW FRAUD ................................................................................ 25

COUNT SEVEN-- BREACH OF CONTRACT ....................................................................... 25

COUNT EIGHT-- BREACH OF EXPRESS WARRANTY ..................................................... 26

COUNT NINE--COMMON LAW CONSPIRACY ................................................................... 27

CONCLUSION ........................................................................................................................ 27

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| *EX REL.* JAMES DEVAGE, | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. SA-98-CA- |
| | § | |
| HEALTHSOUTH CORPORATION, | § | |
| HEALTHSOUTH TEXAS LIMITED | § | |
| PARTNERSHIP, HEALTHSOUTH SPORTS | § | |
| MEDICINE AND REHABILITATION | § | |
| CENTER AND ALL DIRECT | § | |
| AND INDIRECT SUBSIDIARIES AND | § | |
| AFFILIATED PARTNERSHIPS | § | |
| OF HEALTHSOUTH CORPORATION, | § | |
| Defendants | § | |

## PLAINTIFF'S COMPLAINT UNDER 31 U.S.C. § 3730 (UNDER SEAL)

JAMES DEVAGE, Plaintiff, submits this complaint under seal, as follows:

### The parties

1. The plaintiff, JAMES DEVAGE, is an individual residing in San Antonio, Bexar County, Texas. He brings this action against the Defendants for violations of 31 U.S.C. § 3729, for himself and for the United States of America, pursuant to the authority granted by 31 U.S.C. § 3730. Defendants are as follows: (1) HealthSouth Corporation, the parent corporation of a national network of outpatient and/or inpatient rehabilitative and sports medicine facilities, diagnostic facilities and surgery centers; (2) HealthSouth Texas Limited Partnership; (3) HealthSouth Sports Medicine and Rehabilitation Center, an assumed name used by the facility at 9150 Huebner Road, San Antonio, Texas, and also the assumed name used by the facility at 1106 Clayton Lane, Austin, Texas; and (4) All other corporations and/or partnerships in the United States of America which are owned (in whole or in part) or operated by HealthSouth Corporation and all other partnerships in the United

1

States of America where HealthSouth Corporation is a limited partner or a general partner or where a subsidiary or partnership of HealthSouth Corporation is a general or a limited partner. **HealthSouth** as used herein refers to one or more of the Defendants.

2. Defendant, HealthSouth Corporation is a Delaware corporation with its principal place of business at One HealthSouth Parkway, Birmingham, Alabama 35243, and is authorized to do business in Texas. Its registered agent for service of process in Texas is CT Corporation System, 350 N. St. Paul Street, Dallas, TX 75201.

3. Defendant HealthSouth Texas Limited Partnership, is a limited partnership formed under the Alabama Limited Partnership Act of 1983, as amended from time to time. HealthSouth Texas Limited Partnership is authorized to do business in the State of Texas. The registered agent for service of process in the State of Texas is CT Corporation System, 350 North St. Paul Street, Dallas, Texas 75201.

4. HealthSouth Sports Medicine and Rehabilitation Center, the assumed name used for the facility at 9150 Huebner Road, San Antonio, Texas, can be served with process by serving the manager of such facility.

5. HealthSouth Sports Medicine and Rehabilitation Center, the assumed name used for the facility at 1106 Clayton Lane, Austin, Texas, can be served with process by serving the manager of such facility.

6. HealthSouth Texas Limited Partnership has filed assumed name certificates for some other facilities located in Bexar County and Travis County, Texas other than the facility located at 9150 Huebner Road, San Antonio, Texas and the facility located at 1106 Clayton Lane, Austin, Texas, but no assumed name certificate for the name HealthSouth Sports Medicine and Rehabilitation Center has been filed for the facility at 9150 Huebner Road, San Antonio, Texas, or the facility at 1106

Clayton Lane, Austin, Texas, which is the assumed name that both of those facilities used. For the facilities where an assumed name certificate was filed in Austin and San Antonio using the name HealthSouth Sports Medicine and Rehabilitation Center, it reflects that the name is an assumed name for HealthSouth Texas Limited Partnership. The general partner for HealthSouth Texas Limited Partnership is HealthSouth Properties Corporation, a Delaware corporation. HealthSouth Properties Corporation is also a wholly owned subsidiary of Defendant HealthSouth Corporation. The principal place of business for the general partner is 2 Perimeter Park South, Birmingham, AL 35243. The only limited partner as of March 1997 is HealthSouth Holdings, Inc., a Delaware corporation and prior to that time was HealthSouth Rehabilitation Corporation, a Delaware corporation with the same address as the subsequent limited partner. HealthSouth Holdings, Inc. is a Delaware corporation whose mailing address is 2 Perimeter Park South, Birmingham, Alabama, whose Taxpayer Identification Number is 63-0860407. The general partner owns 1% of said limited partnership and the limited partner owns 99% of said limited partnership.

### Filing under seal

7.  In accordance with 31 U.S.C. § 3730 (b) (2), this complaint is filed in camera and will not be served on the Defendants until the Court so orders. Furthermore, a copy of the Complaint and written disclosure of substantially all material evidence and information the Plaintiff possesses have been served on the Government contemporaneously herewith pursuant to 31 U.S.C. § 3730 (b) (2) and Rule 4 (i), Federal Rules of Civil Procedure.

### Jurisdiction and venue

8.  This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3730. The action arises out of violations of 31 U.S.C. § 3729 by the Defendants, and certain of the acts proscribed by 31 U.S.C. § 3729 on which this action is based occurred in this judicial

3

district. In addition, one or more of the Defendants transact and have transacted business in this judicial district, within the meaning of 31 U.S.C. § 3732 (a).

9. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1395.

### Preliminary statement of HealthSouth's fraudulent conduct

10. HealthSouth is the nation's leading provider of outpatient rehabilitative and sports medicine services with a network of approximately 1,150 facilities and locations in all 50 States and the District of Columbia.

11. Many of the patients who receive services at Defendants' facilities are covered by federal health care programs such as Medicare, Medicaid, and CHAMPUS, which are the payors for services rendered by the Defendants to those patients.

12. HealthSouth has knowingly, deliberately, and systematically overcharged federal health care programs for rehabilitative services rendered to patients covered by those programs.

### Plaintiff's direct and independent knowledge and voluntary disclosure of HealthSouth's fraudulent conduct

13. Plaintiff gained direct and independent knowledge of the fraudulent practices used by HealthSouth when he was a patient at one of the facilities controlled by HealthSouth, located at 9150 Huebner Road, San Antonio, Texas. Plaintiff personally and through his counsel voluntarily provided his knowledge of HealthSouth's fraudulent practices to the United States on or about October 7, October 8, December 9, and December 13, 1996, before filing this action.

### Background

**Overview of HealthSouth's organizational structure and operations**

14. HealthSouth operates the largest group of affiliated proprietary outpatient rehabilitation facilities in the United States. HealthSouth's outpatient rehabilitation centers offer a comprehensive range of rehabilitative healthcare services, including physical therapy and occupational therapy, that

are tailored to the individual patient's needs, focusing predominantly on orthopaedic injuries, sports injuries, work injuries, hand and upper extremity injuries, back injuries, and various neurological/ neuromuscular conditions. As of December 31, 1997, HealthSouth provided outpatient rehabilitative healthcare services through approximately 1,150 outpatient locations.

15. HealthSouth is a corporation listed on the New York Stock Exchange with the initials HRC which was organized in 1984. As of December 31, 1997, the last date of their latest 10-K which Plaintiff's counsel have been able to obtain, HealthSouth Corporation, through the use of subsidiary corporations, limited partnerships under the company or a subsidiary corporation, as either the general partner and/or a limited partner, operated approximately 1,150 outpatient locations (which include freestanding outpatient centers and their satellites), 132 inpatient rehabilitation facilities with 7682 beds, 4 medical centers with 800 beds, 172 freestanding surgery centers, 101 diagnostic centers and 93 occupational medicine centers. For the year ending December 31, 1997, according to their 10-K for 1997, HealthSouth Corporation generated revenues of $3,017,269,000.00 and during that year, the revenues generated from patients under Medicare amounted to 36.9%. The income before paying minority interests (interests where other companies or doctors practices have been purchased) and income tax for 1997 was $601,634,000.00. Provision for income taxes for 1997 was $206,153,000.00. For 1997, cash provided by operations was $415,848,000.00. As of December 31, 1997, the company had stockholder's equity of $3,157,428,000.00.

16. HealthSouth owns and operates various healthcare facilities principally through wholly owned subsidiaries and affiliated partnerships. References herein to HealthSouth's "employees" refer to the employees of HealthSouth or HealthSouth's subsidiaries and affiliates, in context.

**HealthSouth's participation in federal health care programs**

17. *Federal health care program* is defined in the Medicare fraud and abuse statute as --

"(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government ...; or

(2) any State health care program, as defined in section 1320a-7(h) ..."

42 U.S.C. § 1320a-7b (f).

18. Federal health care programs include, but are not limited to, Medicare, Medicaid, CHAMPUS, CHAMPVA, Federal Employees Health Benefit Program, Railroad Retirement and Mail Handlers.

19. Although there are numerous federally funded health insurance programs, the Medicare and Medicaid programs account for the majority of government spending in this area.

20. Congress established the Medicare program in 1965 with the adoption of Title XVIII of the Social Security Act. Medicare is a national health insurance program for people 65 years of age and older, certain younger disabled people, and people with kidney failure. Payments from the Medicare program come from the Medicare Trust Fund, which is funded through payroll deductions and additional appropriations by the United States.

21. The Medicare program is administered through the **Health Care Financing Administration (HCFA)**, an agency of the **United States Department of Health and Human Services (HHS)**.

22. Medicare is divided into two parts. **Medicare Part A** means the hospital insurance program authorized under Part A of Title XVIII of the Social Security Act. Part A helps pay for care in a hospital and a skilled nursing facility and for home health and hospice care. **Medicare Part B** means the supplementary medical insurance program authorized under Part B of Title XVIII of the Social Security Act. Part B helps pay for doctor bills, and for outpatient hospital care and various

6

other medical services not covered by Part A.

23. The Medicaid program was created at the same time as Medicare, when Title XIX was added to the Social Security Act. Medicaid is a public assistance program that provides payment of medical expenses for low-income patients. Funding for Medicaid is shared by the United States and those state governments that choose to participate in the program.

24. Over the last thirty-three years, the Medicare and Medicaid programs have enabled elderly, disabled, and low-income patients to obtain necessary medical services from medical providers throughout the United States. Critical to the continued viability and solvency of these programs are the fundamental concepts that medical providers bill the payors only for medical treatments and services that are legitimately medically necessary and actually performed, and further, that medical providers not take advantage of their elderly, disabled, and/or low-income patients.

25. Generally, any *provider* of services is qualified to participate and is eligible for payments under Medicare if it files with the Secretary of Health and Human Services an agreement to accept *assignment* on all Medicare claims for covered items and services. Accepting *assignment* means that the provider agrees to accept the "allowable charge" as determined by Medicare as full payment. 42 U.S.C. § 1395(cc). (Agreements with Providers of Services).

26. The term **"provider"** means a *hospital*, an RPCH, a skilled nursing facility, a *comprehensive outpatient rehabilitation facility* (CORF), a home health agency, or a hospice that has in effect an agreement to participate in Medicare, or a *clinic*, a rehabilitation agency, or a public health agency that has in effect a similar agreement but only to furnish outpatient physical therapy, or speech pathology service, or a community mental health center that has in effect a similar agreement but only to furnish partial hospitalization services. 42 CFR § 400.202 (Definitions specific to Medicare).

27. A CORF is a facility which is primarily engaged in providing (under the supervision of physicians) diagnostic, therapeutic, and restorative services to outpatients for the rehabilitation of injured, disabled, or sick persons and which provides at least the following comprehensive outpatient rehabilitation services: (i) physicians services (rendered by physicians, as defined in 42 U.S.C. § 1395x (r)(1)), who are available at the facility on a full- or part-time basis); (ii) *physical therapy*; and (iii) social or psychological services. 42 U.S.C. § 1395x (cc)(2).

28. HealthSouth and its network of affiliates are providers of services under Medicare and other federal health care programs. HealthSouth's Medicare revenues for 1997 alone amounted to $1,113,372,000.00 ($3,017,269,000.00 X .369).

**Conditions for payment of outpatient physical therapy services under federal health care programs**

29. The outpatient rehabilitative and sports medicine services provided by HealthSouth through its network of facilities includes "outpatient physical therapy services." In order for a provider to be eligible to receive payments for outpatient physical therapy services, the provider must comply with certain federal rules and regulations.

30. Generally, the services must be furnished to a patient under the care of a physician and under a written plan of treatment. The services must be furnished by a *provider* of services as defined by the Medicare regulations. The services must be medically necessary and the provider must obtain a certification of need of the services from the physician.

31. "Outpatient physical therapy services" means physical therapy services furnished by a *provider* of services, a *clinic*, . . . to an individual as an outpatient --

(1) who is under the care of a physician, and

(2) with respect to whom a plan prescribing the type, amount, and duration of physical therapy services that are to be furnished such individual has been established by a physician or by a qualified physical therapist and is periodically reviewed by a physician.

In addition, such term includes physical therapy services furnished to an individual as an inpatient of a *hospital* under certain circumstances. 42 U.S.C 1395x(p).

32. Outpatient physical therapy services provided to patients in rehabilitation hospitals are covered under Medicare Part A.

33. Outpatient physical therapy services provided to patients in CORFS or in clinics are covered Medicare Part B benefits.

34. The basic rule is that Medicare Part B pays for outpatient physical therapy services only if they meet the following conditions:

(1) they are furnished to a beneficiary while he or she is under the care of a physician who is a doctor of medicine, osteopathy, or podiatric medicine;

(2) they are furnished under a *written plan of treatment* that meets the requirements of 42 CFR § 410.61; and

(3) they are furnished

(i) by a provider (e.g. a CORF or clinic that has in effect an agreement to participate in Medicare) ...

42 CFR § 410.60 (Outpatient physical therapy services: Conditions.)

35. The *written plan of treatment* must meet the following requirements:

(1) The plan must be established by a physician or the physical therapist who will furnish the services before treatment begins;

(2) The plan must prescribe the type, amount, frequency, and duration of the physical therapy services to be furnished to the individual, and indicate the diagnosis and anticipated goals;

(3) Any changes in the plan must be in writing, signed by the physician or the physical therapist who furnishes the services or by a registered professional nurse or a staff physician, in accordance with oral orders from the physician or physical therapist who furnishes the services, and incorporated into the plan immediately; and

(4) The physician must review the plan as often as the individual's condition requires, but at least every thirty days, and each review must be dated and signed by the physician who reviewed it.

42 CFR § 410.61 (Plan of treatment requirements for outpatient physical therapy and speech pathology services.)

36. When required, as a further condition for Medicare payment the provider must obtain a *certification of need* for the services from a physician. 42 CFR § 424.5 (a)(4). (Basic Conditions for Medicare Payment)

37. The *certification* requirements for *outpatient physical therapy services* are as follows:

(1) The certification must state that the individual needs physical therapy, that the services were furnished while the individual was under the care of a physician, and that the services were furnished under a plan of treatment;

(2) The certification statement must be obtained at the time the plan of treatment is established, or as soon thereafter as possible;

(3) If the plan of treatment is established by a physician it must be signed by that physician and if the plan of treatment is established by a physical therapist, it must be signed by a physician who has knowledge of the case; and

(4) Recertification statements stating the continuing need for physical therapy and an estimate of how much longer the services will be needed are required at least every 30 days and must be signed by the physician who reviews the plan of treatment.

42 CFR § 424.24(c). (Outpatient physical therapy and speech pathology services)

38. The *certification* requirements for *CORF* services are as follows:

(1) The certification must state that the services were required because the individual needed skilled rehabilitation service, that the services were furnished while the individual was under the care of a physician; and that a written plan of treatment has been established and is reviewed periodically by a physician; and

(2) Recertification is required at least every 60 days, based on review by a facility physician who, when appropriate, consults with the professional personnel who furnish the services, and the recertification statement must state that the plan is being followed, the patient is making progress in attaining the rehabilitation goals, and the treatment is not having any harmful effect on the patient.

42 CFR § 424.27. (Requirements for comprehensive outpatient rehabilitation facility (CORF) services.)

39. Furthermore, no payment may be made under Medicare Part A or B for any expenses incurred for items or services which are not reasonable and necessary for the diagnosis or treatment of injury or to improve the functioning of a malformed body member. 42 U.S.C. 1395(y)(a)(1)(A)

40. For physical therapy services to be considered reasonable and necessary the following conditions must be met:

(1) the services must be considered under accepted standards of medical practice to be a specific and effective treatment for the patient's condition;

(2) the services must be of such a level of complexity and sophistication or the condition of the patient must be such that the services required can be safely and effectively performed only by a qualified physical therapist or under his supervision. Services which do not require the performance or supervision of a physical therapist are not considered reasonable or necessary physical therapy services, even if they are performed or supervised by a physical therapist. (When the intermediary determines the services furnished were of a type that could have been safely or effectively performed only by a qualified physical therapist or under his supervision, it will presume that such services were properly supervised. However, this assumption is rebuttable and if in the course of processing claims, the intermediary finds that physical therapy services are not being furnished under proper supervision, the intermediary will deny the claim and bring this matter to the attention of the Division of Survey and Certification of the HCFA regional office.);

(3) there must be an expectation that the condition will improve significantly in a reasonable period of time based on the assessment made by the physician of the patient's restoration potential after any needed consultation with the qualified physical therapist or the services must be necessary to the establishment of a safe and effective maintenance program required in connection with a specific disease state; and

(4) the amount, frequency, and duration of the services must be reasonable.

Medicare Outpatient Therapy and Comprehensive Outpatient Rehabilitation Facility Manual Sect. 205.5 Covered Physical Therapy Services.

**Coding and terminology systems used to report and bill procedures and services**

41. Different coding systems are used to describe the same service provided in different settings: hospital inpatient, hospital outpatient, and physician office. Each insurer (e.g. Medicare, Medicaid, commercial insurers) specifies which coding system must be used for its claims.

42. HCFA establishes uniform definitions of services and codes to represent those services for use by providers and suppliers to report and bill services for payment or reimbursement under Medicare.

43. The same terminology and coding systems are generally followed by other government and private health care programs.

44. HCFA has adopted the terminology and coding system of the **Physicians' Current Procedural Terminology (CPT)** for reporting and billing Medicare Part B services payable on a *charge basis*. The CPT is published by the American Medical Association and is a systematic listing and coding of contemporary procedures and services performed by physicians in clinical practice in the United States. It provides a uniform language to concisely and accurately describe medical, surgical and diagnostic procedures and thereby simplify the reporting of services. Under this system, each service and procedure is identified by a descriptor (a verbal expression of the name of the service or procedure) and its specifically assigned five-digit identifying code number.

44. **HCFA Common Procedure Coding System Codes (HCPCS)** are also used for reporting and billing Medicare Part B services payable on a *charge basis*. The three levels of HCPCS codes are --

Level 1: CPT codes for physician services.

Level 2: national codes, created by HCFA, for services not included in CPT codes.

Level 3: local codes, created by Medicare intermediaries and carriers (private organizations that handle and pay claims on behalf of the Medicare program) for services not included in the Level 1 or Level 2 codes.

45. The fee schedules of government and private health insurance programs follow the CPT and HCPCS nomenclature and assign a maximum allowable payment or reimbursement amount for each

service and procedure identified by the CPT and HCPCS codes.

46. **Revenue Codes** are used by providers in conjunction with diagnosis and procedure codes for reporting and billing Medicare Part B services payable on a *cost basis*. These three-digit codes identify general categories with different facility revenue centers (e.g. pharmacy, operating room, radiology department, dialysis unit, and physical therapy).

47. Medicare pays for inpatient hospital services on the basis of a **prospective payment system (PPS)**, under which each illness or injury is assigned a **diagnosis-related group (DRG)**. DRGs are patient illness categories that reflect the hospital resources required to treat the illness. Each DRG is assigned a "case weight," which represents the relative average costliness of patients in that DRG compared with the average costliness of all DRGs. Every patient discharged from an acute care hospital can be uniquely classified into one of approximately 500 DRGs used by the Medicare program.

**Coding for physical medicine and rehabilitation services and procedures**

48. The CPT includes a section for *Physical Medicine and Rehabilitation* services and procedures. Physical Medicine and Rehabilitation services and corresponding codes are subdivided into three subsections: Modalities, *Therapeutic Procedures*, and Tests and Measurements.

49. *Therapeutic Procedures* are generally described as follows:

"A manner of effecting change through the application of clinical skills and/or services that attempt to improve function.

*Physician or therapist required to have direct (one on one) patient contact.*"

There are approximately twenty two separate CPT codes to describe therapeutic services and procedures.

50. CPT code 97110 is the code for *therapeutic exercises--*

"Therapeutic procedure, one or more areas, each 15 minutes; *therapeutic exercises to develop strength and endurance, range of motion and flexibility.*"

As stated above, the physician or therapist is required to have direct (one-on-one) contact with the patient.

51. With regard to *therapeutic exercises*, each 15 minute, direct one-on-one contact between the practitioner and patient is considered as one *unit* for billing and payment purposes. That is, one unit of CPT code 97110 is properly charged and billed to federal health care programs for 15 minutes direct one-on-one contact, two units for 30 minutes direct one-on-one contact, three units for 45 minutes direct one-on-one contact, and so forth (assuming the medical necessity of the services in the first instance). Federal health care programs pay and reimburse providers and suppliers for each unit of service.

52. CPT Code 97113 applies to *aquatic therapy with therapeutic exercises.* Again, the physician or therapist is required to have direct (one-on-one) contact with the patient.

53. With regard to *aquatic therapy*, each 15 minute, direct one-on-one contact between the practitioner and patient is considered as one *unit* for billing and payment purposes. One unit of CPT code 97113 is properly charged and billed to federal health care programs for 15 minutes direct one-on-one contact, two units for 30 minutes direct one-on-one contact, three units for 45 minutes direct one-on-one contact, and so forth (assuming the medical necessity of the services in the first instance). However, Ms. Lucy Trejo of HealthSouth told Plaintiff after he completed his visits to HealthSouth that each unit of aquatic therapy was 30 minutes instead of 15 minutes. Federal healthcare programs pay and reimburse providers and suppliers for each unit of service.

54. There is a separate CPT code that applies when therapeutic procedures are performed in a group setting. CPT code 97150 applies to *therapeutic procedure(s), group (2 or more individuals).*

55. Revenue code 42X is the general code for physical therapy services. The specific revenue codes for particular services are as follows:

| Subcategory | Standard Abbreviation |
|---|---|
| 420 - General Classification | PHYSICAL THERP |
| 421 - Visit Charge | PHYS THERP/VISIT |
| 422 - Hourly Charge | PHYS THERP/HOUR |
| 423 - Group Rate | PHYS THERP/GROUP |
| 424 - Evaluation or Re-evaluation | PHYS THERP/EVAL |
| 429 - Other Physical Therapy | OTHER PHYS THERP |

## HealthSouth's fraudulent conduct

**Billing governmental payors for *individual therapeutic exercise (gym) services not performed and/or not medically necessary and/or upcoding***

56. In order to increase reimbursements from federal health insurance programs, HealthSouth has repeatedly sought and received reimbursements from governmental payors for fifteen minute intervals of therapeutic exercises (gym) to develop strength and endurance, range of motion and flexibility, with direct (one-on-one) contact between the patient and the physician or therapist under CPT Code 97110, when in fact one-on-one services were never performed.

57. HealthSouth implemented a system whereby one HealthSouth employee would supervise numerous patients performing exercises designed to increase strength and flexibility which are subsequently billed to governmental payors as individual therapy at a charge of $40.00 per 15-minute interval. The exercises, which are demonstrated to the patients during their first 2 or 3 visits, are later performed by them with little or no direct (one-on-one) contact between the patient and the employee. After the first 2 to 3 visits, the HealthSouth employee did not demonstrate the exercises unless there was a specific question that needed to be answered as to a specific exercise or unless specific assistance was requested. Most of the time such assistance lasted no more than 2 or 3 minutes. HealthSouth continuously sought and received excessive reimbursements by billing the

service for each patient present as individual one-on-one therapeutic exercises under CPT Code 97110 for each fifteen minute interval at $40.00 per 15-minute interval. In those instances where one-on-one assistance was not performed, there was no medical necessity for services for which reimbursement was sought. In fact, even if one-on-one assistance had been provided, the service would not have been medically necessary because the exercises were not of such a level of complexity and sophistication that they could only be safely and effectively performed by a qualified physical therapist or under his/her supervision.

58. For example, during the months of May and June of 1996, Plaintiff would report to the HealthSouth facility at 9150 Huebner Road, San Antonio, Texas. The gym exercises were demonstrated by a HealthSouth employee during Plaintiff's first 2 to 3 visits. The exercises were simple enough to be performed by Plaintiff with little or no supervision. On any given day, there were other patients exercising in the gym. The HealthSouth employee would instruct and/or demonstrate a particular exercise to a patient. The HealthSouth would then leave and let the patient perform the task. The HealthSouth employee would check back at a later time. The way the facility was run, HealthSouth employees did not have direct one-on-one contact with each patient for any extended period of time. In fact, there was not enough staff to have one-on-one contact with each patient. In Plaintiff's case, contact with the HealthSouth employee was limited to instances in which Plaintiff had a question regarding the use of an apparatus or the execution of a particular exercise. When Plaintiff asked a question or needed assistance, typically, such assistance lasted no more than 2 or 3 minutes. In addition, on any day when Plaintiff had an 8:00 o'clock a.m. scheduled gym therapy appointment, Plaintiff was into his floor exercise before a HealthSouth employee addressed Plaintiff. The extent of his one-on-one contact with the HealthSouth employee was "Good morning Mr. DeVage. How do you feel?"

59. In order to increase reimbursements from federal health care programs, HealthSouth has repeatedly sought and received reimbursements from governmental payors for services that were never performed by systematically billing governmental payors for excessive CPT Codes, representing that therapeutic procedures were performed for a more extended period of time than they actually were.

60. For example, the HealthSouth itemization of services provided to the Plaintiff reflects twenty two treatment days in May 1996 through June 1996. For each dated visit, there were specific charges shown for Therapeutic Exercises (gym), referenced by CPT Code 97110, of $40.00 per unit. The Therapeutic Exercises (gym) for a particular day's visit started out on May 7, 1996, with two units at $40.00 each, increased to three units for dated visits from May 10, 1996 through June 5, 1996, and then increased to four units for the dated visits between June 7, 1996 through June 28, 1996. Even though the billing units increased, there was never a change in Plaintiff's routine. Plaintiff always did the same, unsupervised gym therapy for the same amount of time, to wit: 40 minutes. There was no procedure to record the time the Plaintiff left the gym. (This was also true for aquatic therapy described below.)

61. Although there is a CPT code for therapeutic procedures preformed in groups of 2 or more individuals (97150), in connection with Plaintiff, no group therapy was performed or billed for.

**Billing governmental payors for *individual aquatic therapy services not performed and/or not medically necessary and/or upcoding***

62. In order to increase reimbursements from federal health care programs, HealthSouth has repeatedly sought and received reimbursements from governmental payors for fifteen or thirty minute intervals of aquatic therapy with therapeutic exercises, with direct (one-on-one) contact between the patient and the physician or therapist under CPT Code 97113, at a charge of $65.00 per

unit, when in fact the one-on-one services were never performed and/or where the service was not medically necessary.

63. HealthSouth implemented a system whereby one HealthSouth employee would provide aquatic therapy to numerous patients simultaneously, (which were subsequently billed to governmental payors as individual one-on-one therapy under CPT Code 97113). In receiving the therapy, patients performed their exercises independent of each other in the pool. The exercises were demonstrated to the patients during their initial visits. The exercises were simple enough that after the first few visits the patients required little or no supervision by the one HealthSouth employee at the pool. Intervention by the employee, who never entered the pool, was limited to addressing particular questions posed by the patients and/or reminding the patients of the sequence in which the exercises were to be performed. In those instances where one-on-one assistance was not performed, there was no medical necessity for the service for which reimbursement was sought. In fact, even if one-on-one assistance had been provided, the service would not have been medically necessary because the exercises were not of such a level of complexity and sophistication that they could only be safely and effectively performed by a qualified physical therapist or under his/her supervision.

64. In Plaintiff's case, just like with gym therapy, after the HealthSouth employee demonstrated the exercises to the Plaintiff in the first 2 or 3 visits, Plaintiff's contact with the HealthSouth employee was limited to casual greeting or conversation or assistance which lasted no more than 2 to 3 minutes.

65. In addition, Plaintiff had an acquaintance who also was in attendance at HealthSouth located at 9150 Huebner Road, San Antonio, Texas. Plaintiff's acquaintance is herein identified as R.R. On numerous occasions, Plaintiff and R.R. attended the HealthSouth facility at the same times and on the same dates. Itemized charges from HealthSouth reflect they were each billed for two units

of aquatic therapy on May 13, 17, 20, 22, 29, and 31 and June 3, 18, 21, 24, and 28 (on 6-24-96 R.R. was charged for 4 units of aquatic therapy). HealthSouth was billing both Plaintiff and R.R. for one-on-one sessions when they were in the pool at the same time. There was only one HealthSouth employee at the pool. Moreover, R.R. went to the whirlpool located to the pool on six or seven occasions. In those instances, he would go to the whirlpool. The HealthSouth itemization for R.R. reflects that he was billed for aquatic therapy instead of the whirlpool on most occasions this happened. (There is only one whirlpool charge which is $30.00.) The reimbursement received by HealthSouth for aquatic therapy ($65.00) was greater than for the whirlpool ($30.00).

66. Although there is a CPT code for therapeutic procedures performed in groups of 2 or more individuals (97150), in connection with Plaintiff, no group therapy was performed or billed for.

**Misrepresenting place of service**

67. Medicare payments to providers reflect the relative differences in operating expenses realized by providers in different geographic areas. Accordingly, services performed by a provider in one geographic location are often reimbursed at a different rate than the same service provided in a different geographic location.

68. Plaintiff received physical therapy from HealthSouth in San Antonio, Texas. However, his Medicare Benefits Used (Explanation of Medicare Benefits) indicates that he received physical therapy from HealthSouth Sports Medicine and Rehabilitation Center in Austin, Texas. Therefore, Plaintiff believes and alleges that HealthSouth misrepresented the place of service to Medicare and other federal payors in order to obtain excessive reimbursement for the services provided to Plaintiff.

**Illegal referrals-anti-kickback and Stark violations**

69. HealthSouth has entered into illegal business arrangements with physicians.

70. Certain illicit arrangements involve so-called "joint venture" arrangements between HealthSouth, which provides services covered by federal health care programs, and physicians who are in a position to refer business to those facilities. The form of the "joint venture" legal entity may take a variety of forms such as a limited partnership or closely held corporation.

71. Under these illegal arrangements, physicians are investors in the entity. The physician investors refer their patients to this entity, and are paid by the entity in various forms. These illicit arrangements are intended to lock up a stream of referrals from the physician investors and to compensate them indirectly for these referrals, and not to raise investment capital legitimately to start a business.

72. Because physician investors can benefit from their referrals, unnecessary procedures and tests may be ordered or performed, resulting in unnecessary expenditures by federal health care programs.

73. Subject to certain statutory exceptions, 42 U.S.C. § 1320a-7b(b), Illegal remunerations, commonly referred to as the Federal Medicare and Medicaid anti-kickback statute, prohibits individuals and entities from knowingly and willfully soliciting, receiving, offering or paying any remuneration in order to induce business reimbursed under the Medicare or other federal or State health care programs. The types of remuneration covered specifically include kickbacks, bribes, and rebates, whether made directly or indirectly, overtly or covertly, in cash or in kind. Prohibited conduct includes remuneration intended to induce referrals of patients and remuneration intended to induce the purchasing, leasing, ordering, or arranging for any good, facility, service or item paid for by Medicare or other federal or State health care programs.

74. Subject to certain statutory exceptions, 42 U.S.C. § 1395nn, limitation on certain physician referrals, commonly known as "Stark" or the self-referral statute, prohibits a physician from referring

Medicare patients to an entity with which the physician, or an immediate family member of the physician, has a financial relationship. *Stark* also prohibits an entity that furnishes services under a prohibited referral from presenting a claim or bill to the Medicare program or to any individual, third party payor, or other entity for the services performed under the prohibited referral. In short, no Medicare payment may be made for a service that is furnished under a prohibited referral, and an entity that collects payment for a service that was performed under a prohibited referral must refund all collected amounts on a timely basis.

75. As originally enacted ("*Stark* I"), the law prohibited physicians from referring specimens for *clinical laboratory testing* to an entity with whom the physician (or an immediate family member of the physician) had a financial relationship. In 1993, Congress significantly expanded the self-referral prohibition ("*Stark* II") to cover a wide range of other "designated health services" and include physical therapy services, occupational therapy services, clinical laboratory services, physical therapy services, radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services, radiation therapy services and supplies, durable medical equipment and supplies, parenteral and enteral nutrients, equipment and supplies, prosthetics, orthotics, and prosthetic devices and supplies, home health services, outpatient prescription drugs, and inpatient and outpatient hospital services.

76. As set out in HealthSouth Corporation's 10-Ks filed with the Securities and Exchange Commission for the years 1995, 1996, and 1997, many of HealthSouth's rehabilitation hospitals, outpatient rehabilitation facilities, and ambulatory surgical centers involve physician investors who refer patients to those facilities. These arrangements constitute violations of both the anti-kickback statute and *Stark II*. Although HealthSouth has started buying out physician investment interests to correct the violation in some instances, many violations continue to exist. *See* Exhibit "A" 1995 10-

K, Exhibit "B" 1996 10-K, and Exhibit "C" 1997 10-K attached hereto which are excerpts from the 10-K's applicable to this paragraph.

### The United States has been damaged

77. Since at least as early as May 1996, HealthSouth has profited and the United States has been damaged monetarily by the practices used by HealthSouth to make false claims to federal health care programs for payment and reimbursement. Through their multiple outpatient physical therapy facilities and their fraudulent practices of billing for services not performed, billing for ineligible services and services for which there was no medical necessity, upcoding, and misrepresenting the place of service, HealthSouth has submitted many false claims for excessive and unauthorized payments and reimbursements and has obtained excessive compensation from the United States as a result.

78. As shown by the bill for Mr. DeVage, all billing for HealthSouth San Antonio was done out of Birmingham, Alabama, the parent company's headquarters. HealthSouth Corporation (the parent company) is liable for all acts of its subsidiaries and affiliated partnerships in submitting these false claims since it is the parent corporation and all of the income from its' subsidiaries and affiliated partnerships is reported in the 10-K of HealthSouth Corporation

### Count one

### False Claims Act 31 U.S.C. § 3729 (a) (1)

79. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs one through 78 of this complaint.

This is a claim for treble damages, civil penalties and attorney's fees, under the False Claims Act, 31 U.S.C. §§ 3729, et seq. as amended.

By means of the acts described above, HealthSouth knowingly presented or caused to be presented false or fraudulent claims for payment of medical services to the United States

government. The United States, unaware of the falsity of the claims made by HealthSouth, and in reliance on the accuracy thereof, paid HealthSouth for claims that would otherwise not have been allowed.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## Count two

### False Claims Act 31 U.S.C. § 3729 (a) (2)

80.  Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs one through 78 of this complaint.

This is a claim for treble damages, civil penalties and attorney's fees, under the False Claims Act, 31 U.S.C. §§ 3729, et seq. as amended.

By means of the acts described above, HealthSouth knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims for medical services paid by the United States Government. The United States, unaware of the falsity of the records or statements made by HealthSouth, and in reliance on the accuracy thereof, paid HealthSouth for claims that would otherwise not have been allowed.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## Count three

### False Claims Act 31 U.S.C. § 3729 (a) (3)

81.  Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs one through 78 of this complaint.

This is a claim for treble damages, civil penalties and attorney's fees, under the False Claims Act, 31 U.S.C. §§ 3729, et seq., as amended.

By means of the acts described above, HealthSouth conspired to defraud the United States Government by getting false or fraudulent claims allowed or paid. The United States, unaware of the falsity of the records, statements or claims made by HealthSouth, and in reliance on the accuracy thereof, paid HealthSouth for claims that would otherwise not have been allowed.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## Count Four

### Unjust Enrichment

82. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this complaint.

As a result of the conduct described in this Count HealthSouth was paid federal funds under the Medicare and Medicaid programs to which they were not entitled.

In consequence of the acts set forth in this Count, HealthSouth has been unjustly enriched at the expense of the United States, under circumstances dictating that, in equity and good conscience, the money should be returned to the United States.

## Count Five

### Payment by Mistake of Fact

83. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this complaint.

As a result of the conduct described in this Count, HealthSouth was paid federal funds under the Medicare and Medicaid programs that were not properly payable to them.

At the time such payments were made, the Health Care Financing Administration (HCFA) was unaware of HealthSouth's wrongful conduct. Had HCFA known that HealthSouth was not entitled to receive reimbursement or payment, HCFA would not have approved payment of such funds. Payments were made to HealthSouth by mistake of fact.

In consequence of the acts set forth in this Count, the United States is entitled to recover those funds paid to HealthSouth by mistake of the United States.

## Count Six

### Common law fraud

84. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this complaint.

As a result of the conduct described in this Count, HealthSouth was paid federal funds under the Medicare and Medicaid programs that were not properly payable to them.

By means of the acts described above, HealthSouth conspired to defraud the United States Government by getting false or fraudulent claims allowed and paid. The United States, unaware of the falsity of the records, statements and claims made by HealthSouth, and in reliance on the accuracy thereof, paid HealthSouth for claims that would otherwise not have been allowed.

By reason of these payments, the United States had been damaged, and continued to be damaged, in a substantial amount.

## Count Seven

### Breach of contract

85. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this complaint.

As a result of the conduct described in this Count, HealthSouth was paid federal funds under the Medicare and Medicaid programs that were not properly payable to them.

By means of the acts described above, HealthSouth breached their contracts with the United States Government by getting false or fraudulent claims allowed or paid. The United States, unaware of the falsity of the records, statements and claims made by HealthSouth, and in reliance on the accuracy thereof, paid HealthSouth for claims that would otherwise not have been allowed.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

<u>**Count Eight**</u>

**Breach of express warranty**

86. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this complain.

As a result of the conduct described in this Count, HealthSouth was paid federal funds under the Medicare and Medicaid programs that were not properly payable.

By means of acts described above, HealthSouth breached an express warranty with the United States Government by getting false or fraudulent claims allowed and paid. The United States, unaware of the falsity of the records, statements or claims made by HealthSouth, and in reliance on the accuracy thereof, paid HealthSouth for claims that would otherwise not have been allowed.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## Count Nine

### Common law conspiracy

87. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 78 of this complaint.

By means of the acts described above, HealthSouth conspired to defraud the United States Government by getting false or fraudulent claims allowed and paid. The United States, unaware of the falsity of the records, statements or claims made by HealthSouth, and in reliance on the accuracy thereof, paid HealthSouth for claims that would otherwise not have been allowed.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

### Conclusion

WHEREFORE, Plaintiff prays that upon trial or final hearing the court grant judgment for Plaintiff and the United States against HealthSouth, as follows:

a. for civil penalties for each false claim, including false claims resulting from violations of Stark II and the anti-kickback statutes, pursuant to 31 U.S.C. § 3729 (a);

b. for three times the amount of damages proved, pursuant to 31 U.S.C. § 3729 (a);

c. for reasonable attorneys' fees and expenses;

d. for costs of court;

e. for pre-judgment and post-judgment interest at the rates permitted by law; and

f. for such other and further relief as may be appropriate and authorized by law.

Plaintiff further prays that he be awarded an appropriate percentage of the amount recovered by and for the United States as a result of this action, in accordance with 31 U.S.C. § 3730 (d).

Respectfully submitted,

TINSMAN & HOUSER, INC.
One Riverwalk Place
700 N. St. Mary's Street, 14th Floor
San Antonio, TX  78205
Tel: (210) 225-3121
Fax: (210) 225-6235

By: _____
Richard Tinsman
State Bar No. 20064000
Sharon Savage
State Bar No. 04747200
**ATTORNEY IN CHARGE**

GLENN GROSSENBACHER
State Bar No. 08541100
1800 McCullough
San Antonio, TX  78212
Tel: (210) 271-3888
Fax: (210) 271-3980

GOODE, CASSEB & JONES
Rand J. Riklin
State Bar No. 16924275
John E. Clark
State Bar No. 04287000
One Riverwalk Place, Suite 1700
700 N. St. Mary's Street
San Antonio, TX  78205
Tel: (210) 225-6030
Fax: (210) 224-9810

28

Laser D SEC EDGAR Filing

Company Name:
Exchange:
Ticker Symbol:
Company #:

HEALTHSOUTH CORP
N
HRC
H376075250

Document Type:
Document Date:
Amendment:
Document #:

10-K
12/31/95

96540112

EXHIBIT

A

provided to Medicare beneficiaries. Outpatient rehabilitation facilities certified by Medicare as rehabilitation agencies are reimbursed on the basis of the lower of reasonable costs for services provided to Medicare beneficiaries or charges for such services. Outpatient rehabilitation facilities which are physician-directed clinics, as well as outpatient surgery centers, are reimbursed by Medicare on a fee screen basis; that is, they receive a fixed fee, which is determined by the geographical area in which the facility is located, for each procedure performed. The Company's outpatient rehabilitation facilities submit monthly bills to their fiscal intermediaries for services provided to Medicare beneficiaries, and the Company files annual cost reports with the intermediaries for each such facility. Adjustments are then made if costs have exceeded payments from the fiscal intermediary or vice versa.

The Company's inpatient facilities (other than the medical center facilities) either are not currently covered by PPS or are exempt from PPS, and are also cost-reimbursed, receiving the lower of reasonable costs or charges.

- 11 -

Typically, the fiscal intermediary pays a set rate based on the prior year's costs for each facility. As with outpatient facilities subject to cost-based reimbursement, annual cost reports are filed with the Company's fiscal intermediary and payment adjustments are made, if necessary.

Congress has directed the United States Department of Health and Human Services to develop regulations, which could subject inpatient rehabilitation hospitals to PPS in place of the current "reasonable cost within limits" system of reimbursement. In addition, informal proposals have been made for a prospective payment system for Medicare outpatient care. Other proposals for a prospective payment system for rehabilitation hospitals are also being considered by the federal government. Therefore, the Company cannot predict at this time the effect that any such changes may have on its operations. Regulations relating to prospective payment or other aspects of reimbursement may be developed in the future which could adversely affect reimbursement for services provided by the Company.

Over the past several years an increasing number of healthcare providers have been accused of violating the federal False Claims Act. That Act prohibits the knowing presentation of a false claim to the United States government. Because the Company performs thousands of similar procedures a year for which it is reimbursed by Medicare and there is a relatively long statute of limitations, a billing error could result in significant civil penalties. The Company does not believe that it is or has been in violation of the False Claims Act.

## Relationships with Physicians and Other Providers

Various state and federal laws regulate relationships among providers of healthcare services, including employment or service contracts and investment relationships. These restrictions include a federal criminal law prohibiting (i) the offer, payment, solicitation or receipt of remuneration by individuals or entities, to induce referrals of patients for services reimbursed under the Medicare or Medicaid programs or (ii) the leasing, purchasing, ordering, arranging for or recommending the lease, purchase or order of any item, good, facility or service covered by such programs (the "Fraud and Abuse Law"). In addition to federal criminal sanctions, violators of the Fraud and Abuse Law may be subject to significant civil sanctions, including fines and/or exclusion from the Medicare and/or Medicaid programs.

In 1991, the Office of the Inspector General ("OIG") of the United States Department of Health and Human Services promulgated regulations describing compensation arrangements which are not viewed as illegal remuneration under the Fraud and Abuse Law (the "Safe Harbor Rules"). The Safe

Harbor Rules create certain standards ("Safe Harbors") for identified types of compensation arrangements which, if fully complied with, assure participants in the particular arrangement that the OIG will not treat such participation as a criminal offense under the Fraud and Abuse Law or as the basis for an exclusion from the Medicare and Medicaid programs or an imposition of civil sanctions. The OIG closely scrutinizes health care joint ventures involving physicians and other referral sources. In 1989, the OIG published a Fraud Alert that outlined questionable features of "suspect" joint ventures.

In 1992, regulations were published in the Federal Register implementing the OIG sanction and civil money penalty provisions established in the Fraud and Abuse Law. The regulations (the "Exclusion Regulations") provide that the OIG may exclude a Medicare provider from participation in the Medicare Program for a five-year period upon a finding that the Fraud and Abuse Law has been violated. The regulations expressly incorporate a test adopted by three federal circuit courts providing that if one purpose of remuneration that is offered, paid, solicited or received is to induce referrals, then the statute is violated. The regulations also provide that after the OIG establishes a factual basis for excluding a provider from the program, the burden of proof shifts to the provider to prove that the Fraud and Abuse Law has not been violated.

The Company operates five of its rehabilitation hospitals and almost all of its outpatient rehabilitation facilities as limited partnerships. Three of the rehabilitation hospital partnerships involve physician investors, and two of the rehabilitation hospital partnerships involve other institutional healthcare providers. Seven of the

- 12 -

outpatient partnerships currently have a total of 21 physician limited partners, some of whom refer patients to the partnerships. Those partnerships which are providers of services under the Medicare program, and their limited partners, are subject to the Fraud and Abuse Law. A number of the relationships established by the Company with physicians and other healthcare providers do not fit within any of the Safe Harbors. The Safe Harbor Rules do not expand the scope of activities that the Fraud and Abuse Law prohibits, nor do they provide that failure to fall within a Safe Harbor constitutes a violation of the Fraud and Abuse Law; however, the OIG has informally indicated that failure to fall within a Safe Harbor may subject an arrangement to increased scrutiny.

Most of the Company's surgery centers are owned by limited partnerships, which include as limited partners physicians who perform surgical procedures at such centers. Subsequent to the promulgation of the Safe Harbor Rules in 1991, the Department of Health and Human Services issued for public comment additional proposed Safe Harbors, one of which specifically addresses surgeon ownership interests in ambulatory surgery centers (the "Proposed ASC Safe Harbor"). As proposed, the Proposed ASC Safe Harbor would consider payments to be made to surgeons as a return on investment interest in a surgery center if, among other conditions, all the investors are surgeons who are in a position to refer patients directly to the center and perform surgery on such referred patients. Since a subsidiary of the Company is an investor in each limited partnership which owns a surgery center, the Company's arrangements with physician investors do not fit within the Proposed ASC Safe Harbor as currently proposed. The Company is unable at this time to predict whether the Proposed ASC Safe Harbor will become final, and if so, whether the language and requirements will remain as currently proposed, or whether changes will be made prior to becoming final. There can be no assurance that the Company will ever meet the criteria under the Proposed ASC Safe Harbor as proposed or as it may be adopted in final form. The Company believes, however, that its arrangements with physicians with respect to its surgery center facilities should not fall within the activities prohibited by the Fraud and Abuse Law.

While several federal court decisions have aggressively applied the

restrictions, of the Fraud and Abuse Law, they provide little guidance as to the application of the Fraud and Abuse Law to the Company's limited partnerships. The Company believes that it is in compliance with the current requirements of applicable federal and state law, but no assurances can be given that a federal or state agency charged with enforcement of the Fraud and Abuse Law and similar laws might not assert a contrary position or that new federal or state laws, or new interpretations of existing laws, might not adversely affect relationships established by the Company with physicians or other healthcare providers or result in the imposition of penalties on the Company or certain of its facilities. Even the assertion of a violation could have a material adverse effect upon the Company.

The so-called "Stark II" provisions of the Omnibus Budget Reconciliation Act of 1993 amend the federal Medicare statute to prohibit the making by a physician of referrals for "designated health services" (including physical therapy and occupational therapy) to an entity in which the physician has an investment interest or other financial relationship, subject to certain exceptions. Such prohibition took effect on January 1, 1995 and applies to all of the Company's outpatient rehabilitation facility partnerships with physician limited partners. In addition, a number of states have passed or are considering statutes which prohibit or limit physician referrals of patients to facilities in which they have an investment interest. In response to these regulatory activities, the Company has restructured most of its rehabilitation facility partnerships which involve physician investors, in order to eliminate physician ownership interests not permitted by applicable law. The Company intends to take such actions as may be required to cause the remaining partnerships to be in compliance with applicable laws and regulations, including, if necessary, the prohibition of physician partners from referring patients. The Company believes that this restructuring has not adversely affected and will not adversely affect the operations of its facilities.

Ambulatory surgery is not identified as a "designated health service", and the Company does not believe that ambulatory surgery is subject to the restrictions set forth in Stark II. However, lithotripsy facilities operated by the Company frequently operate on hospital campuses, and it is possible to conclude that such services are "inpatient and outpatient hospital services" -- a category of proscribed services within the meaning of Stark II. Similarly, physicians frequently perform endoscopic procedures in the procedure rooms of the Company's surgery centers, and it is also possible to construe these services to be "designated health services". While the Company

- 13 -

does not believe that Stark II was intended to apply to such services, if that were determined to be the case, the Company intends to take steps necessary to cause the operation of its facilities to comply with the law.

The Company cannot predict whether other regulatory or statutory provisions will be enacted by federal or state authorities which would prohibit or otherwise regulate relationships which the Company has established or may establish with other healthcare providers or the possibility of materially adverse effects on its business or revenues arising from such future actions. Management of the Company believes, however, that the Company will be able to adjust its operations so as to be in compliance with any regulatory or statutory provision as may be applicable. See this Item, "Business -- Patient Care Services" and "Business -- Sources of Revenues".

Insurance

Beginning December 1, 1993, the Company became self-insured for professional liability and comprehensive general liability. The Company purchased coverage for all claims incurred prior to December 1, 1993. In addition, the Company purchased underlying insurance which would cover all claims once established limits have been exceeded. It is the opinion of

## Disclosure SEC EDGAR Filing

Company Name:        HEALTHSOUTH CORP
Exchange:            N
Ticker Symbol:       HRC
Company #:           H376075250

Document Type:       10-K
Document Date:       12/31/96
Amendment:
Document #:          97566010

EXHIBIT

B

to their fiscal intermediaries for services provided to Medicare beneficiaries, and the Company files annual cost reports with the intermediaries for each such facility. Adjustments are then made if costs have exceeded payments from the fiscal intermediary or vice versa.

The Company's inpatient facilities (other than the medical center facilities) either are not currently covered by PPS or are exempt from PPS, and are also cost-reimbursed, receiving the lower of reasonable costs or charges. Typically, the fiscal intermediary pays a set rate based on the prior year's costs for each facility. As with outpatient facilities subject to cost-based reimbursement, annual cost reports are filed with the Company's fiscal intermediary and payment adjustments are made, if necessary.

Congress has directed the United States Department of Health and Human Services to develop regulations, which could subject inpatient rehabilitation hospitals to PPS in place of the current "reasonable cost within limits" system of reimbursement. In addition, informal proposals have been made for a prospective payment system for Medicare outpatient care. Other proposals for a prospective payment system for rehabilitation hospitals are also being considered by the federal government. Therefore, the Company cannot predict at this time the effect that any such changes may have on its operations. Regulations relating to prospective payment or other aspects of reimbursement may be developed in the future which could adversely affect reimbursement for services provided by the Company.

Over the past several years an increasing number of healthcare providers have been accused of violating the federal False Claims Act. That Act prohibits the knowing presentation of a false claim to the United States government. Because the Company performs thousands of similar procedures a year for which it is reimbursed by Medicare and there is a relatively long statute of limitations, a billing error could result in significant civil penalties. The Company does not believe that it is or has been in violation of the False Claims Act.

Relationships with Physicians and Other Providers

Various state and federal laws regulate relationships among providers of healthcare services, including employment or service contracts and investment relationships. These restrictions include a federal criminal law prohibiting (i) the offer, payment, solicitation or receipt of remuneration by individuals or entities, to induce referrals of patients for services reimbursed under the Medicare or Medicaid programs or (ii) the leasing, purchasing, ordering, arranging for or recommending the lease, purchase or order of any item, good, facility or service covered by such programs (the "Fraud and Abuse Law"). In addition to federal criminal sanctions, violators of the Fraud and Abuse Law may be subject to significant civil sanctions, including fines and/or exclusion from the Medicare and/or Medicaid programs.

In 1991, the Office of the Inspector General ("OIG") of the United States Department of Health and Human Services promulgated regulations describing compensation arrangements which are not viewed as illegal remuneration under the Fraud and Abuse Law (the "Safe Harbor Rules"). The Safe Harbor Rules create certain standards ("Safe Harbors") for identified types of compensation arrangements which, if fully complied with, assure participants in the particular arrangement that the OIG will not treat such participation as a criminal offense under the Fraud and Abuse Law or as the basis for an exclusion from the Medicare and Medicaid programs or an imposition of civil sanctions. The OIG closely scrutinizes health care joint ventures involving physicians and other referral sources. In 1989, the OIG published a Fraud Alert that outlined questionable features of "suspect" joint ventures.

In 1992, regulations were published in the Federal Register

implementing the OIG sanction and civil money penalty provisions established in the Fraud and Abuse Law. The regulations (the "Exclusion Regulations") provide that the OIG may exclude a Medicare provider from participation in the Medicare Program for a five-year period upon a finding that the Fraud and Abuse Law has been violated. The regulations expressly incorporate a test adopted by three federal circuit courts providing that if one purpose of remuneration that is offered, paid, solicited or received is to induce referrals, then the statute is violated. The regulations also provide that after the OIG

- 13 -

establishes a factual basis for excluding a provider from the program, the burden of proof shifts to the provider to prove that the Fraud and Abuse Law has not been violated.

The Company currently operates four of its rehabilitation hospitals and many of its outpatient rehabilitation facilities as limited partnerships with third-party investors. Two of the rehabilitation hospital partnerships involve physician investors, and two of the rehabilitation hospital partnerships involve other institutional healthcare providers. Eight of the outpatient partnerships currently have a total of 21 physician limited partners, some of whom refer patients to the partnerships. Those partnerships which are providers of services under the Medicare program, and their limited partners, are subject to the Fraud and Abuse Law. A number of the relationships established by the Company with physicians and other healthcare providers do not fit within any of the Safe Harbors. The Safe Harbor Rules do not expand the scope of activities that the Fraud and Abuse Law prohibits, nor do they provide that failure to fall within a Safe Harbor constitutes a violation of the Fraud and Abuse Law; however, the OIG has informally indicated that failure to fall within a Safe Harbor may subject an arrangement to increased scrutiny.

Most of the Company's surgery centers are owned by limited partnerships, which include as limited partners physicians who perform surgical procedures at such centers. Subsequent to the promulgation of the Safe Harbor Rules in 1991, the Department of Health and Human Services issued for public comment additional proposed Safe Harbors, one of which specifically addresses surgeon ownership interests in ambulatory surgery centers (the "Proposed ASC Safe Harbor"). As proposed, the Proposed ASC Safe Harbor would protect payments to be made to surgeons as a return on investment interest in a surgery center if, among other conditions, all the investors are surgeons who are in a position to refer patients directly to the center and perform surgery on such referred patients. Since a subsidiary of the Company is an investor in each limited partnership which owns a surgery center, the Company's arrangements with physician investors do not fit within the Proposed ASC Safe Harbor as currently proposed. The Company is unable at this time to predict whether the Proposed ASC Safe Harbor will become final, and if so, whether the language and requirements will remain as currently proposed, or whether changes will be made prior to becoming final. There can be no assurance that the Company will ever meet the criteria under the Proposed ASC Safe Harbor as proposed or as it may be adopted in final form. The Company believes, however, that its arrangements with physicians with respect to its surgery center facilities should not fall within the activities prohibited by the Fraud and Abuse Law.

While several federal court decisions have aggressively applied the restrictions of the Fraud and Abuse Law, they provide little guidance as to the application of the Fraud and Abuse Law to the Company's limited partnerships. The Company believes that it is in compliance with the current requirements of applicable federal and state law, but no assurances can be given that a federal or state agency charged with enforcement of the Fraud and Abuse Law and similar laws might not assert a contrary position or that new federal or state laws, or new interpretations of existing laws, might not adversely affect relationships established by the Company with physicians or other healthcare providers or result in the imposition of penalties on the Company or certain of its facilities. Even the assertion of a violation could have a material adverse effect upon the Company.

The so-called "Stark II" provisions of the Omnibus Budget Reconciliation Act of 1993 amend the federal Medicare statute to prohibit the making by a physician of referrals for "designated health services" (including physical therapy, occupational therapy, radiology services or radiation therapy) to an entity in which the physician has an investment interest or other financial relationship, subject to certain exceptions. Such prohibition took effect on January 1, 1995 and applies to all of the Company's outpatient

**Disclosure SEC EDGAR Filing**

| | |
|---|---|
| Company Name: | HEALTHSOUTH CORP |
| Exchange: | N |
| Ticker Symbol: | HRC |
| Company #: | H376075250 |
| | |
| Document Type: | 10-K |
| Document Date: | 12/31/97 |
| Amendment: | |
| Document #: | 98583329 |

EXHIBIT

C

The FPS program has been beneficial for the rehabilitation segment of the healthcare industry because of the economic pressure on acute-care hospitals to discharge patients as soon as possible. The result has been increased demand for rehabilitation services for those patients discharged early from acute-care hospitals. Outpatient rehabilitation services and freestanding inpatient rehabilitation facilities are currently exempt from FPS, and inpatient rehabilitation units within acute-care hospitals are eligible to obtain an exemption from FPS upon satisfaction of certain federal criteria.

Currently, 12 of the Company's outpatient centers are Medicare-certified Comprehensive Outpatient Rehabilitation Facilities ("CORFs") and 432 are Medicare-certified rehabilitation agencies. CORFs have been designated cost-reimbursed Medicare providers since 1982. Under the regulations, CORFs are reimbursed reasonable costs (subject to certain limits) for services provided to Medicare beneficiaries. Outpatient rehabilitation facilities certified by Medicare as rehabilitation agencies are reimbursed on the basis of the lower of reasonable costs for services provided to Medicare beneficiaries or charges for such services. Outpatient rehabilitation facilities which are physician-directed clinics, as well as outpatient surgery centers, are reimbursed by Medicare on a fee screen basis; that is, they receive a fixed fee, which is determined by the geographical area in which the facility is located, for each procedure performed. The Company's outpatient rehabilitation facilities submit monthly bills to their fiscal intermediaries for services provided to Medicare beneficiaries, and the Company files annual cost reports with the intermediaries for each such facility. Adjustments are then made if costs have exceeded payments from the fiscal intermediary or vice versa.

The Company's inpatient facilities (other than the medical center facilities) either are not currently covered by FPS or are exempt from FPS, and are also cost-reimbursed, receiving the lower of reasonable costs or charges. Typically, the fiscal intermediary pays a set rate based on the prior year's costs for each facility. As with outpatient facilities subject to cost-based reimbursement, annual cost reports are filed with the Company's fiscal intermediary and payment adjustments are made, if necessary.

As part of the Balanced Budget Act of 1997, Congress directed the United States Department of Health and Human Services to develop regulations that would subject inpatient rehabilitation hospital to a FPS. The prospective rates are to be phased in beginning October 1, 2000, and are to be fully implemented on October 1, 2002. The Act requires that the rates must equal 98% of the amount of payments that would have been made if the FPS had not been adopted. In addition, the Act requires the establishment of a FPS for hospital outpatient department services, effective for services furnished beginning in 1999. Since the drafting of the regulations covering these initiatives is in very early stages, the Company cannot predict at this time the effect that any such changes may have on its operations.

Over the past several years an increasing number of healthcare providers have been accused of violating the federal False Claims Act. That Act prohibits the knowing presentation of a false claim to the United States government. Because the Company performs thousands of similar procedures a year for which it is reimbursed by Medicare and there is a relatively long statute of limitations, a billing error could result in significant civil penalties. The Company does not believe that it is or has been in violation of the False Claims Act.

## Relationships with Physicians and Other Providers

Various state and federal laws regulate relationships among providers of healthcare services, including employment or service contracts and investment relationships. These restrictions include a federal criminal law prohibiting (i) the offer, payment, solicitation or receipt of remuneration by individuals or entities, to induce referrals of patients for services reimbursed under the Medicare or Medicaid programs or (ii) the leasing, purchasing, ordering, arranging for or recommending the lease, purchase or order of any item, good,

facility, or service covered by such programs (the "Fraud and Abuse Law"). In addition to federal criminal sanctions, violators of the Fraud and Abuse Law may be subject to significant civil sanctions, including fines and/or exclusion from the Medicare and/or Medicaid programs.

In 1991, the Office of the Inspector General ("OIG") of the United States Department of Health and Human Services promulgated regulations describing compensation arrangements which are not viewed as illegal remuneration under the Fraud and Abuse Law (the "Safe Harbor Rules"). The Safe

11

interests are not directly covered by the Safe Harbor Rules, the Company does not believe that such arrangements violate the Fraud and Abuse Law because radiologists are typically not in a position to make or induce referrals to diagnostic centers. In addition, the Company's mobile lithotripsy operations are conducted by partnerships in which urologists are limited partners. Because such urologists are in a position to, and do, perform lithotripsy procedures utilizing the Company's lithotripsy equipment, the Company believes that the same analysis underlying the Proposed ASC Safe Harbor should apply to ownership interests in lithotripsy equipment held by